yes your honor and there are four issues that I've raised in this appeal I'd like to address one of them that's on the guideline calculation for count three the reason I added that issue in the mix is because I've raised an issue regarding the guideline or the sentence imposed on count one which received a 37 month sentence and I believe that if I didn't at least address the technical issue raised on count three that there may be some technical issue on harmlessness so I had to attack I believe the guideline calculation on count three in order to obtain the relief that mr. Rodriguez-Verdusco is seeking so I will submit that issue on the brief unless there are any questions relating to the calculation of count three also this morning as I'm trying to develop a theme for my issue for which is substantive reasonableness I realize that I would have a better argument before the court if I have a psychological or neuropsychological evaluation and the court didn't grant a mitigated sentence based on neuropsychological evaluation so I believe that count one is really the issue that I'd like to focus primarily on and that is the court's denial of sufficient funding to hire two experts in order to complete a neuropsychological evaluation for mitigation of and the record is in the history of my request is well documented in the excerpt of record in my request started in October of 2010 and continued through April 11th of 2011 trying to get sufficient funding for two experts to complete a neuropsychological evaluation of mr. Rodriguez-Verdusco in the court Mr. Hormel, I wonder if I could ask you a question given the nature of this crime who's convicted of what conspiracy and destruction of government property in connection with a marijuana growing operation if I understand it given the nature of the mens rea involved in these crimes and given the fact that your I'm not clear you know why you would need $25,000 for further psychological testing given the nature of the offenses yes your honor and I believe my last request and I know the amount that I'm asking for is a large amount my last request I believe was closer to 26,000 27,000 I did start out with 45,000 but I was able to work through this process work with dr. Delgado who was would be have been the most expensive expert to get her to streamline some of her conduct that would satisfy dr. Llorente and getting his social history in order to complete the neuropsychological evaluation but the key to that question your honor is that page 110 of the excerpt of record and dr. Llorente indicated that the difficulties as noted by defense counsel and others ascertained defendants neuropsychological profile remains of concern as the presence of neuropsychological deficits often factor into a defendant's ability to make appropriate choices in other words that goes to the judgment or the end or getting into the involved in the crime itself has nothing to do really with the safety valve or anything like that it's it's impairs you the the judgment or the person's ability and and to make a reasoned decision as to whether getting to get involved in the crime itself dr. defendants are more susceptible to suggestion and are easily taken advantage of by others who are more sophisticated this is not to say that defendants with neuropsychological deficits commit crimes however the presence of neuropsychological deficits in a person will make him or her easily more easily persuaded by others in other words to get involved in criminal activity that they may not otherwise get involved in so it goes to the I think the can to case that cited in my reply brief it goes there's a connection between the neuropsychological deficits and a person who has such deficits in getting involved in this sort of crime itself and so it is a mitigating factor to the offense itself and that that is the reason why I believe that getting funds sufficient funds that the court did grant the $2,400 per expert that is but she didn't give sufficient funds to complete this neuropsychological evaluation so I guess the way I look at the case is that she she she she requested and I don't know that it was unreasonable and I guess the question whether it's an abuse of her discretion ultimately in denying this she requested after giving the 2,400 I think for each of the X the preliminary experts are what I'll call preliminary experts the first two experts that if you wanted additional funds that you know it would be based on particularized evidence of cognitive impairment and she wasn't satisfied that it was my response to that is is I've done this work now for almost 20 years federal defense work and I have to rely on what the experts tell me is indicated based on what my conversations are with the experts and in this case I didn't only have dr. Yolanda you didn't they didn't just have my information about my ability to communicate with my client and work through the case with my client but he also had dr. de Elgato's rough albeit rough clinical interview that was done by telephone and with her impressions of what was required so that so the point of doing a psychological workup is is if you have factors that indicate the need for it that's why you do it I I couldn't tell this court whether or not what evidence was there that he was he was bullied into participating in this crime these crimes your honor it you know the evidence would show that he was recruited but I'm not claiming he was bullied I guess I guess the well I mean even if he's more susceptible to persuasion what what evidence is there that there was any persuasion applied to him you know more than that anybody else gets persuaded by to do things your honor I I suppose what my answer to that is because there is I don't believe there's any evidence of persuasion other than that the a person if he's if he's susceptible to persuasion but there was no persuasion applied I don't get where this helps you well he was recruited by money that's that's okay but that's not exactly mitigating you know well it is when you have a certain neuropsychological deficit your honor because what a person that has a neuropsychological deficit it has verbal reasoning issues they have issues receiving information and they have executive functioning issues and those are the issues that only an expert can to answer the questions that the court would have those are all issues that the court would have to address when evaluating an expert's testimony but I'm not the expert your honor that's that's why there's no but the expert's testimony my point is the expert's testimony only becomes relevant if you have some evidence that would connect it to why he did what he did well and and my answer that you're on your answer I believe I understood your answer is that what got him into this crime is they offered offered him money and from that you would say that you need $26,000 to have an expert that says he's he can be persuaded by money so let me I guess let me back let me back up with that what miss what the record indicates your honor and and is that he was recruited to work and that the the recruitment of work was the was the receipt of money mr. Rodriguez Verduzco indicated indicated that indicated that he didn't know he was going up to a marijuana grow until he actually got there and and so if there's any persuasion it's when you're I guess the persuasive persuasive force at that point in time is likely an inability to escape the situation so however the the circuit recognizes mitigation in a person's you know background and mental disorders that create a diminished capacity that could influence the judgment in in making decisions that mr. Rodriguez Verduzco made in this case so that's the basis for why I went to the court so on the cost was was quite a bit but there isn't very many experts who are bilingual that I know of that can conduct this sort of testing that was necessary for mr. Rodriguez Verduzco so I understand the expense I understand the cost containment issues that are floating out there but also believe that in this case there was a particular rise need for the experts you said there's Dr. Udente is the only one I know of I'm not sure how many are out there but at least I know of him I worked with him before and he did indicate that a bilingual expert in neuropsychological testing was indicated I thank you very much mr. Holmes yes morning your honors my name is Tim Holmes I'm from the US Attorney's Office in Spokane here representing the government your honor I think if the court looks back at the record at what the district court judge did in this case considering the issue of whether she abused her discretion in applying the statute this is a case where she was sympathetic toward the defense where she worked with the defense where she tried to talk through her concerns about the request for the funds not only about the amount of the funds but she was specific early on back in October when the very first request was made asking mr. Hormel in the ex parte hearing what is it that makes you think this is necessary and the responses troubled her because they seemed generalized and non-specific to her having to do with the defendant's age he was 20 years old he'd been in the u.s. was represented at that time for two years dr. Udente has a slightly different interpretation says he was here for perhaps three or four years and that there was something in his affect that he sort of stared and was too agreeable or indicated too easily that he understood what was being said despite those concerns the the judge did grant funds and she said basically let's go through this on a step-by-step manner let's approve some funds then you come back to me and we'll we'll we'll go from there so that was in October now and I think it's important to consider as well that at that point in time mr. Hormel was saying I need this money because there's a Miranda issue out there I need this money to just to determine whether or not my client voluntarily waived his Miranda rights that was the issue that was before the court what followed from that was a phone interview that was again had district court judge participation in ordering the marshals to set this up and following that phone interview there was a report issued and a follow-up motion and that motion was for basically a face-to-face type forensic interview a further interview conducted with the first expert who conducted the phone and at that point in time the defense indicated that Miranda was no longer at issue in other words what I said at the last hearing about why need this I don't need it for that reason anymore the reason why Miranda wasn't an issue is because the cell phones had been analyzed by that point in time and there were photographs of the different both defendants in the marijuana grow and photographs of the marijuana in various stages of growth photographs of the defendant in this case with his co-defendant with their arms around each other smiling and I'm sorry so the the ex parte motion to approve additional expert funds filed April 4 2011 identifies clearly what you've just said it's no longer needed to challenge the voluntariness of the confession but is necessary for mitigation at sentencing and it goes through the analysis and the reasoning and attached was dr. Laurentiis declaration so what about the declaration wasn't clear or didn't establish the reasoning that led the judge to say that there wasn't enough at that point because I understand her process or what appears to be is that she took the initial information wasn't quite persuaded but said okay you can have an expert conduct a preliminary interview and then come back to me if you have something more substantial and that was done and I look at this set forth that raised this whole issue about potential deficits in terms of appreciation of the nature and extent of the crime and voluntariness and so forth at least to perhaps serve as a basis for further testing and so help me understand that at this point was it ambiguous of this declaration not specific enough so it wasn't an abuse of discretion I think that it was because the number one the factors were still cited in the context of he he could possibly have a neurological deficit and we would have to do these tests to find out and he has certain risk the problem I think that the court had was that the risk factors were general in nature and essentially the risk factors derived from the from the fact that this defendant grew up in a agricultural village in Mexico and and many many many of the factors that are cited are just general to that condition he he had a poor education well he had a better education in his co-defendant he got through eighth grade his co-defendant got through sixth grade dr. Uriente mentioned statutory child what he's referencing is the fact that he went to work as a child and under apparently under Mexican statutes that constitute is within the definition of a child what about mental illness in his family and possibly a neurological history as well that has to do with a brother that suffered some type of neurological some type of paralysis but there was no no further connection between that that condition and the defendant there's there's speculation about maybe he was exposed to herbicides or pesticides or fertilizers maybe he was maybe he wasn't there's no indication that he applied those chemicals it's just that the the the expert knew that these are generally used in Mexico so the conditions that he's raising are are very broad and very specific about this defendant but how do you well there are specific things in terms of his family history you'd agree with that specifically a reference to mental illness and the neurological history apparently referring to the brother so I guess my question to you is if there is perhaps a defendant who the there's a there's a mental deficit how do you know that if you don't have an expert give them a battery of tests and interview them face-to-face and isn't that the same similar situation that we're we're dealing with here yes your honor it's a similar situation of what we're dealing with here and the court has to assess that and the court has to exercise this discretion and make a decision I think we're talking about mental illness there was some question about the mother being nervous I don't think that judge Peterson was particularly impressed with that you're talking about a mother who has nine children in a in a in this rural home and that it was this generalized statement that the defendant said that his mother was nervous and that he had a brother who did have some type of neurological problem but it seems to me that there's more that could have been done if counsel was was was truly interested in going down this path and trying to set up some type of further interview even getting a list of questions from dr. Yankee that he would want to have posed to the defendant something more specific that would be that would that would that would clearly trigger the need for this expenditure and all I'm saying these facts mr. Jones can I ask you what did these facts about the mother's nervousness the herbicide exposure the child labor all these other things that were were just mentioned were they before judge Peterson was she aware of these things she was through the reports because both of the both of the reports were included in the sentencing materials submitted by mr. Hormel and she clearly considered the individual characteristics of both defendants that sentencing as well as the nature of the crime itself which occurred over a lengthy period of time and one of the one apart from a neurological analysis that one might do to ask about how how well the defendant responds to or how articulate he is or something of that nature we have a defendant that managed a large-scale marijuana grow in the woods for two individual that had a sixth-grade education there's there's a certain sort of practical skill and ability that goes with this I get my questions maybe along the same line judge Silverman I mean how can we infer that the district court or the PSI PSR considered the evidence of possible mental illness in Rodriguez you know so that at the time of sentencing was that evident in anywhere in the record well it was it it was evident in the sense that she did refer to his lack of sophistication his lack of education and his family his life circumstances his lack of experience but she didn't specifically say and there may be a neurological deficit I think that she was looking at the practical some of the practical elements of the case I mean she said they're not individuals who are sophisticated individuals they're each 20 years old they haven't had extensive life experience let alone any other type of experience it basically says they're young and they're not educated this is after four days of hearings and this is after a month many month-long process of this court having ex parte hearings with counsel and considering the applications for the funds and and and expressing her concerns about what additional information she needed to make a decision thank you very much somebody else has any questions thank you very much thank you thank you mr. Hormel and thank you we're out of time I'll give you two you were but I'll give you two minutes to respond say that dr. Delgado at page 83 indicated that mr. Rodriguez Verduzco appeared below his eighth grade education that he appeared at 84 that he his impression who is a mentally younger than a 20 year old and in relation to all of the in the kid that kid before it was that presented to judge Peterson she aware of that that was ex parte okay so so she that information is in front of her to consider if she sees fit right yes your honor and and and I guess my point is is the Strickland v Washington test is that if you have information it needs to be investigated and that's what dr. Delgado's function would have been in this overall process was investigating on behalf of mr. Rodriguez Verduzco these risk factors that are mentioned in here that's what investigation does that leads to neuropsychological evaluations and mitigation in court so that that's my point your honor thank you thank you thank you very much
judges: Kobayashi, Silverman, Murguia